**Tomaki JUDA, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Aikizi LEWIS, et al.,
Plaintiff–Intervenors,**

v.

**The UNITED STATES, Defendant.**

**No. 172–81L.**

United States Claims Court.

Nov. 10, 1987.

Jonathan M. Weisgall, Washington, D.C., attorney of record, for plaintiffs and plaintiff-intervenors.

Gary B. Randall, Washington, D.C., with whom was Acting Asst. Atty. Gen. Roger J. Marzulla, for defendant. Marjorie R. Bloom, Washington, D.C., Dept. of Energy, and Howard L. Hills, Washington, D.C., JAG–USN, Legal Advisor, Dept. of State, of counsel.

## MEMORANDUM OF DECISION

HARKINS, Senior Judge.

In 1981 and 1982, fourteen petitions on behalf of approximately 5,000 inhabitants of the Marshall Islands were filed in the United States Court of Claims to claim damages said to result from the United States program to test nuclear weapons during the period June 30, 1946, to August 18, 1958. The United States program included detonation of 23 atomic and hydrogen bombs at Bikini Atoll and 43 nuclear bombs at Enewetak Atoll, and required the removal of the inhabitants and their relocation. There was severe physical destruc-

tion at Bikini Atoll and Enewetak Atoll, and radioactive contamination of parts of the Marshall Islands chain. Damages claimed ranged from $450 million to $600 million.

The 14 cases that have been filed by the Marshall Islanders involve three groups of people: inhabitants of the Bikini Atoll (*Tomaki Juda, et al. v. United States*, docket No. 172–81L); inhabitants of the Enewetak Atoll (*Johannes Peter, et al. v. United States*, 461–82L); and inhabitants of atolls and islands that were not used as atomic test sites (12 cases consolidated under the lead case *Limojwa Nitol, et al. v. United States*, docket No. 453–81L). The claims of the Bikini and Enewetak people differ significantly on the facts, and each are distinguishable factually from the claims in the *Nitol* series of cases. The three types of claims have been handled separately, with only the *Nitol* cases consolidated.

At the time the cases were filed in the United States Court of Claims, negotiations between the United States and the government of the emerging Republic of the Marshall Islands (RMI) toward a Compact of Free Association were well advanced. After a period of suspension to avoid interference with the negotiations, the suspensions were terminated on April 13, 1983, and oral argument was heard on August 2, 1983, on defendant's motions to dismiss. In the *Juda* case, it was determined that the inhabitants of Bikini Atoll had stated claims within the jurisdiction of the court under the Tucker Act (28 U.S.C. § 1491(a)(1) (1982)), that sovereign immunity of the United States had been waived, and that the claims were not barred by the statute of limitations. 28 U.S.C. § 2501 (1982). Defendant's motion to dismiss was denied as to the Bikini claims that there were (1) takings in violation of the Fifth Amendment, and (2) breaches of an implied-in-fact contract that arose in 1946 and which created fiduciary obligations owed to the people of Bikini. *Juda v. United States*, 6 Cl.Ct. 441 (1984). In the *Peter* case, it was determined that the statute of limitations barred the taking claims of the Enewetak people, that certain other claims were without merit, and that the complaint had stat-ed a claim within the jurisdiction of the court under the Tucker Act. Defendant's motion to dismiss was denied as to the Enewetak claim that there were breaches of an implied-in-fact contract that imposed on the United States responsibilities in the nature of a fiduciary. *Peter v. United States*, 6 Cl.Ct. 768 (1984). In the *Nitol* series of cases, it was decided the complaints stated claims for an unlawful taking within the jurisdiction of the court under the Tucker Act that were not barred by the statute of limitations. Defendant's motion to dismiss was denied as to the taking claims, and allowed as to all other claims of these plaintiffs. *Nitol v. United States*, 7 Cl.Ct. 405 (1985).

Defendant's motions to dismiss also contained argument on the capacity of the government of the Marshall Islands to espouse plaintiffs' claims under international law, and on the contention that plaintiffs' claims were not justiciable because they presented a political question. The political question issue and the espousal issue were not then ripe for decision. The Compact of Free Association with the Marshall Islands government had not been ratified and neither issue had been briefed fully. The United States specifically reserved its right to raise these issues subsequently when, and if, a change in the factual context would make disposition of these issues appropriate.

After the rulings on defendant's motions to dismiss, defendant filed answers to the surviving claims and orders were entered for pretrial preparation of the cases. In December 1985, defendant gave notice of final action in Congress on the joint resolution to approve the Compact of Free Association with the RMI and moved to suspend pretrial proceedings pending disposition of the remaining jurisdictional issues. Orders were entered to document and preserve information obtained in discovery and to establish a briefing schedule on the jurisdictional issues.

On March 4, 1986, in each case defendant filed motions to dismiss on the ground that the claims were non-justiciable because they now involve a political question. Af-

ter objections from plaintiffs to piecemeal disposition of the remaining jurisdictional issues, a new schedule was established to provide a vehicle for accelerated briefing of all remaining jurisdictional issues that would ripen after the Compact became effective.

On November 4, 1986, defendant filed amended motions to dismiss in each case. The amended motions added lack of jurisdiction over the subject matter as a ground for dismissal and argued that the Section 177 Agreement divested the court of jurisdiction over plaintiffs' claims. Argument was heard on the amended motions on April 23, 1987. At the close of argument, the parties were directed to submit additional briefs addressing two issues: (1) Whether the Compact and the Section 177 Agreement were in effect and operative, and (2) Whether Congress had withdrawn the consent of the United States to be sued in the United States Claims Court on plaintiffs' claims.

Defendant's amended motions to dismiss included matters outside the pleadings which were not excluded by the court. In each case, plaintiffs asserted that these additional materials required that the motions to dismiss be treated as motions for summary judgment and disposed of as provided by RUSCC 56. Plaintiffs filed motions for leave to file affidavits pursuant to RUSCC 56(g). The affidavits asserted, in part, that additional discovery was essential to enable plaintiffs to make an effective response to new factual assertions made by defendant.

In order that the record could reflect the contentions of the parties, on August 28, 1987, plaintiffs' motions for leave to file affidavits were allowed in part. Counsel were advised that, on the record before the court, no ruling could be made on the merits of plaintiffs' claims, and that, accordingly, defendant's motions would not be converted to motions for summary judgment. The material in the record additional to the pleadings that the parties had attached to the briefing papers relates to the issue of withdrawal of the Government's consent to be sued on plaintiffs' claims. Defendant's

amended motions to dismiss were grounded on lack of jurisdiction over the subject matter. The motions were not based on the contention that plaintiffs had failed to state a claim. RUSCC 12(b) provides that the instruction to treat a motion to dismiss as a motion for summary judgment will be appropriate when the motion to dismiss is for failure of the pleadings to state a claim upon which relief can be granted. A motion for lack of jurisdiction over subject matter under RUSCC 12(b)(1) is not converted to a motion for summary judgment when the court considers matters outside the pleadings. *See Stanley v. CIA,* 639 F.2d 1146, 1158 (5th Cir.1981), *citing Mortensen v. First Federal Savings and Loan Assn.,* 549 F.2d 884, 891 (3d Cir.1977); *Rosemound Sand and Gravel Co. v. Lambert Sand and Gravel Co.,* 469 F.2d 416, 417 (5th Cir.1972); *Riley v. Titus,* 190 F.2d 653, 655 n. 1 (D.C.Cir.1951).

On August 28, 1987, oral argument was heard on the materials filed in response to the order for additional briefing. At the close of argument, confirmed by order August 31, 1987, a ruling was made that defendant's motion to dismiss for lack of subject matter jurisdiction would be allowed. The parties were advised that final judgment would be entered dismissing the cases after a statement of reasons was prepared and a further order of the court was filed.

## DEVELOPMENTS

Background information concerning the Trust Territory of the Pacific Islands, the Trusteeship Agreement between the United States and the United Nations Security Council (UNSC), and United States efforts, in its administration of the Trust Territory, to develop in the four governmental entities a capacity for self determination is provided in the previous rulings in the *Juda, Peter* and *Nitol* cases. These rulings were concerned for the most part with the claims alleged, and with United States actions up to the submittal on March 30, 1984, of the Compact of Free Association to Congress for its approval. The facts set forth in these rulings apply to defendant's

new motions to dismiss; they will not be reiterated here, except as needed for continuity. Additional facts, relevant to the period 1944 to 1984, are provided for perspective on the issue of the effective date of the Compact and its supplemental agreements, and information relevant to post–1984 developments are set forth below.

From the war time occupation of Micronesia in 1944 to approval of the Trust Territory Agreement on July 18, 1947, United States military authorities controlled the Pacific Islands. In 1947, military government was terminated, and administration of the Trust Territory was delegated to the Secretary of the Navy. Some elements of the taking claims and breach of contract claims in the *Juda* case and the *Peter* case occurred during this period.

At the end of World War II, there was little doubt that Micronesia would remain under United States control. There was vigorous debate as to whether to annex the area or to place it under the trusteeship system of the United Nations. Military leaders and the Secretary of War urged outright annexation for strategic reasons. The Secretary of State, on the other hand, urged that Micronesia be made a trusteeship, to implement the principle of no territorial aggrandizement that had been expressed in the Atlantic Charter and the Cairo Declaration. Disagreement within the United States Government was not resolved until structures were developed in the United Nations relationship that assured the United States would have full control and full strategic rights in the area. These concerns resulted in a procedure that provided two categories of trusteeship: (1) non-strategic trust areas, overseen by the General Assembly, and the United Nations Trusteeship Council (UNTC) and (2) territories designated as strategic trust areas, overseen by the Security Council and the UNTC. *See generally Foreign Relations of the United States, Diplomatic Papers: Conferences at Malta and Yalta 1945*, at 92 (1955); R. Russell and J. Muther, *A History of the United Nations Charter*, 578 (1958).

Eleven trusteeship agreements were approved under the United Nations Charter; 10 were for non-strategic trusts, and one, the Trusteeship Agreement for the Pacific Islands, was designated as a strategic trust. The Trusteeship Agreement represents the only instance where the United States has assumed responsibility for administering a foreign territory under the authority of an international organization.

The United Nations Charter, in Articles 75 through 85, provides for the international trusteeship system. Article 76(b) is a recognition of the principle that an administering authority is accountable to the international community for administration of the trust area. It obligates the administering authority to promote the political advancement of the inhabitants of the trust territories and their progressive development towards self-government or independence. Article 83 provides that the Security Council would exercise all functions of the United Nations relating to strategic areas. The Charter, however, does not specifically authorize the Security Council to approve the termination of a strategic trusteeship agreement. Article 83 provides:

1. All functions of the United Nations relating to strategic areas, including the approval of the terms of the trusteeship agreements and of their alteration or amendment, shall be exercised by the Security Council.

2. The basic objectives set forth in Article 76 shall be applicable to the people of each strategic area.

3. The Security Council shall, subject to the provisions of the trusteeship agreements and without prejudice to security considerations, avail itself of the assistance of the Trusteeship Council to perform those functions of the United Nations under the trusteeship system relating to political, economic, social, and educational matters in the strategic areas.

The Trusteeship Agreement is a treaty in the nature of a bilateral contract between the Security Council and the United States. Article 6 of the Trusteeship Agreement

obligates the United States, in the discharge of its obligations under Article 76(b) of the Charter, to foster the development of such political institutions as are suited to the trust territory, and to promote the development of the inhabitants towards self-government or independence as may be appropriate to the particular circumstances of the territory and its peoples. The United States agreed to give the inhabitants of the Trust Territory a progressively increasing share in the administrative services in the territory and to develop their participation in government.

Article 15 of the Trusteeship Agreement provides: "The terms of the present agreement shall not be altered, amended or terminated without the consent of the administering authority." During the negotiations for the agreement, the representative of the Soviet Union objected to this provision and proposed language which would have permitted the Security Council unilaterally to alter, amend or terminate the Agreement. The United States representative refused to agree to the provision that would give the Security Council such power, and, to protect United States strategic interests, insisted that no termination could occur without the consent of the United States.

During the 1960's, in administering the Trusteeship Agreement, the United States initiated efforts to prepare the people for the transition to constitutional self-government. In 1965, the Congress of Micronesia was created and elected leaders from all parts of the Trust Territory met to discuss common problems and to explore the concept of political unity. Initially, the United States encouraged, and the Trust Territory leaders explored, the possibility of commonwealth status for the various island groups. This proposal was not generally accepted. Further, differences in geography, history and culture made it difficult to create a single governmental unit that included all of the inhabitants of the Trust Territory. Four separate political entities ultimately were established.

On March 24, 1976, the United States approved the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America." Pub.L. No. 94–241, 90 Stat. 263 (1976) (codified as amended at 48 U.S.C. § 1681 n. (1982)). The constitution for the Federated States of Micronesia (FSM) was ratified on July 12, 1978. The Republic of the Marshall Islands approved its constitution in a referendum on March 1, 1979, and inaugurated a parliamentary constitutional government on May 1, 1979. The constitution for the Republic of Palau was approved at a U.N. observed referendum on July 9, 1979. The results of this referendum subsequently were voided by the Palau legislature and a second referendum was scheduled. The constitution was defeated in a referendum held October 23, 1979. In April 1980, the High Commissioner approved a Palau public law which provided a time table for the installation of a government under the original constitution. Under the terms of the bill, the Palau constitution took effect on January 1, 1981.

After July 1, 1962, all necessary powers of civil government provided by the Trusteeship Agreement had been exercised by the Secretary of the Interior. On April 25, 1979, the Secretary recognized the new governmental entities of the Federated States of Micronesia, the Marshall Islands, and Palau, and delegated to each the executive, legislative and judicial functions of the government of the Trust Territory of the Pacific Islands. Secretary Order No. 3039, April 25, 1979. Order No. 3039 provided that the High Commissioner shall continue to exercise all authority necessary to carry out United States obligations under the 1947 Trusteeship Agreement. This retained authority specifically listed eight categories of administrative functions, including Budget, Accounting, Relations with other United States Government Agencies and Foreign Governments. All laws of the three governmental units were required to be submitted to the High Commissioner for approval.

A Compact of Free Association was negotiated with each of the individual states. The governments of the United States and the Marshall Islands and the governments of the United States and the Federated

States of Micronesia initialed the Compact on October 31, 1980. The Compact with the government of Palau was initialed on November 17, 1980. Further reviews followed, and the final version of the Compact of Free Association with the Republic of Palau was signed on August 26, 1982, and with the Federated States of Micronesia, on October 1, 1982. The Compact of Free Association and its related agreements were signed by the United States and the RMI on June 25, 1983.

After execution by the signatory governments, the Compacts were presented to the people in plebiscites monitored by international observers from the United Nations Trusteeship Council. The Federated States of Micronesia plebiscite was held in June 1983, and the Compact was approved by 79 percent. The RMI plebiscite was held in September 1983, and the Compact was approved by 58 percent. In Palau, plebiscites were held on February 10, 1983, and on modified versions on September 4, 1984, and February 1, 1986. On February 24, 1986, the President of the Republic of Palau certified to the United States that the Compact had been approved.

The Compact of Free Association was submitted to Congress on March 30, 1984. Action on the legislation was not completed in the 98th Congress, and the Compact was resubmitted to the 99th Congress on February 20, 1985. Hearings were held in each body, and each passed differing versions. The legislation was not referred to a conference committee; differences were resolved in meetings between representatives from each body and from the Administration. The final version, House Joint Resolution No. 187, was presented without a Conference Report; it was approved by the House of Representatives on December 11, 1985, and by the Senate on December 13, 1985. It was signed by the President on January 14, 1986. Pub.L.No. 99–239, 99 Stat. 1770 (1986). By its terms (Section 471(c)), the Compact has the force and effect of a statute under the laws of the United States.

The legislation that approves the Compact of Free Association with the RMI and the FSM bears the title "Compact of Free Association Act of 1985" (Compact Act). It contains Titles I through V. Title I includes provisions that relate to approval of the Compact, interpretation of, and United States policies regarding, the Compact, and supplemental provisions. Title II contains the terms of the Compact of Free Association as signed by the parties and approved in the plebiscites. Compact Titles III, IV and V relate to Pacific policy reports, clarification of certain trade and tax provisions, and to the Compact with the Republic of Palau.

A number of provisions relate to the effective date of the Compact. Section 101(b) of the Compact Act provides:

(b) MARSHALL ISLANDS.—The Compact of Free Association set forth in title II of this joint resolution between the United States and the Government of the Marshall Islands is hereby approved, and Congress hereby consents to the subsidiary agreements as set forth on pages 115 through 391 of House Document 98–192 of March 30, 1984, as they relate to such Government. Subject to the provisions of this joint resolution, the President is authorized to agree, in accordance with section 411 of the Compact, to an effective date for and thereafter to implement such Compact, having taken into account any procedures with respect to the United Nations for termination of the Trusteeship Agreement.

Section 411 of the Compact provides:

This Compact shall come into effect upon mutual agreement between the Government of the United States, acting in fulfillment of its responsibilities as Administering Authority of the Trust Territory of the Pacific Islands, and the Government of the Marshall Islands or the Federated States of Micronesia and subsequent to the completion of the following:

(a) Approval by the Government of the Marshall Islands or the Federated States of Micronesia in accordance with its constitutional processes.

(b) Conduct of the plebiscite referred to in Section 412.

(c) Approval by the Government of the United States in accordance with its constitutional processes.

Section 171 of the Compact suspends the laws of the United States to the Trust Territory on the effective date. Section 171 provides:

> Except as provided in this Compact or its related agreements, the application of the laws of the United States to the Trust Territory of the Pacific Islands by virtue of the Trusteeship Agreement ceases with respect to the Marshall Islands and the Federated States of Micronesia as of the effective date of this Compact.

Section 127 of the Compact provides:

> Except as otherwise provided in this Compact or its related agreements, all obligations, responsibilities, rights and benefits of the Government of the United States as Administering Authority which have resulted from the application pursuant to the Trusteeship Agreement of any treaty or other international agreement to the Trust Territory of the Pacific Islands on the day preceding the effective date of this Compact are no longer assumed and enjoyed by the Government of the United States.

Section 177 of the Compact provides a procedure for the disposition of claims that have resulted from the nuclear testing program. A separate agreement between the United States and the RMI is authorized to provide for the settlement of all such claims. (Section 177 Agreement). Section 177 provides that "This separate agreement shall come into effect simultaneously with this Compact and shall remain in effect in accordance with its terms." Article XIII, Sec. 1, of the Section 177 Agreement provides "This Agreement shall come into effect simultaneously with the Compact in accordance with Section 177 of the Compact."

Section 177 of the Compact in its entirety provides:

> (a) The Government of the United States accepts the responsibility for compensation owing to citizens of the Marshall Islands, or the Federated States of Micronesia (or Palau) for loss or damage to property and person of the citizens of the Marshall Islands, or the Federated States of Micronesia, resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958.

> (b) The Government of the United States and the Government of the Marshall Islands shall set forth in a separate agreement provisions for the just and adequate settlement of all such claims which have arisen in regard to the Marshall Islands and its citizens and which have not as yet been compensated or which in the future may arise, for the continued administration by the Government of the United States of direct radiation related medical surveillance and treatment programs and radiological monitoring activities and for such additional programs and activities as may be mutually agreed, and for the assumption by the Government of the Marshall Islands of responsibility for enforcement of limitations on the utilization of affected areas developed in cooperation with the Government of the United States and for the assistance by the Government of the United States in the exercise of such responsibility as may be mutually agreed. This separate agreement shall come into effect simultaneously with this Compact and shall remain in effect in accordance with its own terms.

> (c) The Government of the United States shall provide to the Government of the Marshall Islands, on a grant basis, the amount of $150 million to be paid and distributed in accordance with the separate agreement referred to in this Section, and shall provide the services and programs set forth in this separate agreement, the language of which is incorporated into this Compact.

The Compact Act approves Compact Section 177, and by reference specifically incorporates the provisions of the Section 177 Agreement into the Compact Act. Section 103(g) of the Compact Act provides:

(g) ESPOUSAL PROVISIONS.—(1) It is the intention of the Congress of the United States that the provisions of section 177 of the Compact of Free Association and the Agreement between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact (hereafter in this subsection referred to as the "Section 177 Agreement") constitute a full and final settlement of all claims described in Articles X and XI of the Section 177 Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement.

(2) In furtherance of the intention of Congress as stated in paragraph (1) of this subsection, the Section 177 Agreement is hereby ratified and approved. It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of such Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

The Section 177 Agreement provides for the establishment and operation of a Claims Tribunal by the RMI. The Claims Tribunal would have "jurisdiction to render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program...." Article IV, § 1(a) of the Section 177 Agreement includes the following limitation: "This section confers in the Claims Tribunal no jurisdiction over the United States, its agents, employees, contractors, citizens or nationals with respect to claims of the Government, citizens or nationals of the Marshall Islands arising out of the Nuclear Testing Program."

Article X, Section 1 of the Section 177 Agreement provides:

*Section 1—Full Settlement of All Claims*

This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions.

Article XII of the Section 177 Agreement provides:

All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

On May 28, 1986, the UNTC, in Resolution No. 2183, reaffirmed that the peoples of the Northern Mariana Islands, the RMI, the FSM and Palau had "freely exercised their right to self-determination in plebiscites observed by visiting missions of the Trusteeship Council." The UNTC determined that the United States as the Administering Authority "has satisfactorily discharged its obligations under the terms of the Trusteeship Agreement and that it is appropriate for that Agreement to be terminated." The UNTC requested that the United States, in consultation with the respective government, agree on a date no later than September 30, 1986, for the full entry into force of the Compact of Free Association and the Commonwealth Covenant, and to inform the Secretary General of the United Nations of that date. The official records of the UNSC for the period ending June 30, 1986, show that UNTC Resolution No. 2183 was reported to the Security Council.

Between May and October 1986, representatives of the United States and repre-

sentatives of the RMI negotiated to establish an effective date for the Compact. On October 10, 1986, the parties executed an agreement that provides that, pursuant to Section 411 of the Compact, the effective date of the Compact would be October 21, 1986.

On October 16, 1986, the President issued Executive Order No. 12,569 to provide for changes in the responsibilities of United States officials when the Compact became effective. The Secretary of State was made responsible for conducting government-to-government relations with the RMI, FSM and the Republic of Palau. The responsibilities of the Secretary of the Interior were redefined to include:

> Sec. 2 *Responsibility of the Secretary of the Interior.* The Secretary of the Interior shall be responsible for seeking the appropriation of funds for and, in accordance with the laws of the United States, shall make available to the Freely Associated States the United States economic and financial assistance appropriated pursuant to Article I of Title Two of the Compact; the grant, service, and program assistance appropriated pursuant to Article II of Title Two of the Compact; and all other United States assistance appropriated pursuant to the Compact and its related agreements. The Secretary shall coordinate and monitor any program or any activity by any department or agency of the United States provided to the Freely Associated States and shall coordinate and monitor related economic development planning. This Section shall not apply to services provided by the Department of Defense to the Freely Associated States or to activities pursuant to Section 1 of this Order, including activities under the Peace Corps Act.

Section 8, *Supersession and Savings Provisions,* of the Executive Order provides:

> (a) Subject to the provisions of Section 9 of this Order, prior Executive orders concerning the former Trust Territory of the Pacific Islands are hereby superseded and rendered inapplicable, except that the authority of the Secretary of the Interior as provided in applicable provisions of Executive Order No. 11021, as amended, shall remain in effect, in a manner consistent with this Order and pursuant to section 105(c)(2) of the Act, to terminate the trust territory government and discharge its responsibilities, at which time the entirety of Executive Order No. 11021 shall be superseded.

> (b) Nothing in this Order shall be construed as modifying the rights or obligations of the United States under the provisions of the Compact or as affecting or modifying the responsibility of the Secretary of State and the Attorney General to interpret the rights and obligations of the United States arising out of or concerning the Compact.

By letter dated October 23, 1986, the United States Permanent Representative to the United Nations notified the Secretary General of the United Nations that, as a consequence of consultations held between the United States Government and the Government of the RMI, "agreement has been reached that October 21, 1986, is the date upon which the Compact of Free Association with the Marshall Islands enters fully into force."

On November 3, 1986, the President announced in Proclamation No. 5564 that, as of that day, the United States "has fulfilled its obligations under the Trusteeship Agreement with respect to the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, and the Federated States of Micronesia, and they are self-governing and no longer subject to the Trusteeship." Proclamation No. 5564, further provided:

> Section 1. I determine that the Trusteeship Agreement for the Pacific Islands is no longer in effect as of October 21, 1986, with respect to the Republic of the Marshall Islands, as of November 3, 1986, with respect to the Federated States of Micronesia, and as of November 3, 1986, with respect to the Northern Mariana Islands. This constitutes the determination referred to in Section 1002 of the Covenant.

In keeping with its decision that the RMI was a sovereign, self-governing state, on April 22, 1987, the President's nomination of the U.S. diplomatic representative to the Marshall Islands, was announced, and on May 4, 1987, the Government of the RMI was notified formally that the general relations between the two governments would be governed by international law as reflected in the Vienna Convention on Diplomatic Relations, and that the RMI representatives would be accorded status commensurate with the heads of diplomatic missions as this expression is used in the Convention. On June 3, 1987, the U.S. Senate gave its consent to appointment of the President's nominee.

The new political status of the RMI under the Compact is further recognized in the following actions:

—the Department of the Treasury has ceased payment of funds appropriated by Congress for the Marshall Islands pursuant to the Trusteeship Agreement and has begun making payments to the Marshall Islands pursuant to the Compact. The United States grant outlay to the Marshall Islands under the Trusteeship Agreement would have been approximately $9 million. For fiscal year (FY) 1987, payments under the Compact will total approximately $190 million, including $40 million in direct grants and $150 million to the manager of the Fund created pursuant to the Section 177 Agreement.

—plaintiffs in these cases have entered into agreements to implement the Section 177 Agreement, and have borrowed in excess of $9 million by collateralizing the initial payments they have begun to receive under the Section 177 Agreement.

## DISPOSITION

In 1984, in the *Juda*, *Peter* and *Nitol* cases, it was determined that the complaints stated claims within the subject matter jurisdiction of this court. Defendant's amended motions to dismiss put in issue whether subsequent actions by the Marshall Islands people, by Congress, by the UNTC, and by the President, have the effect of withdrawing, as to all plaintiffs, the consent of the United States to be sued under the Tucker Act on these claims. Initially, any such withdrawal of consent to suit depends on whether the jurisdiction stripping provisions of the Compact and the Section 177 Agreement have gone into effect. If they are in effect, this issue then becomes whether they are operative so that the court lacks authority to continue this litigation.

Review of the changes in conditions that apply to plaintiffs, and to resolution of their claims, that have occurred since plaintiffs' claims arose is appropriate to put these issues in perspective. Plaintiffs' taking claims and breach of contract claims, in the *Juda* case and the *Peter* case, started during the period when plaintiffs were inhabitants of territories that were subject to military government after belligerent occupation. The remaining elements of plaintiffs' claims arose during the period when plaintiffs were residents in a Trust Territory, and subject to the guardian-ward relationship defined in the Trusteeship Agreement between the United Nations and the United States. Under the trusteeship, the Trust Territory of the Pacific Islands was divided into four separate governmental units. Since the 1960's, the RMI has been *statu nascendi*, a government evolving into statehood, through a series of administrative actions by the United States and the UNTC under the Trusteeship Agreement. J. Crawford, *The Creation of States in International Law*, 391–96 (1979); I. Brownlie, *Principles of Public International Law*, 481–82 (3d ed. 1979). *See* L. Henkin, *International Law*, 202 (quoting Lissitzyn, *Territorial Entities Other Than States in the Law of Treaties* (1980)). Plaintiffs now are citizens of the RMI, a state whose capacity for self-government is officially recognized. RMI's capacity for self-government, and its competency to enter a status of free association with the United States, has been recognized by the UNTC, by both Houses of Congress, and by the President.

All parties agree that the political status of free association that is recognized in the Compact Act, and the guardian-ward rela-

tionship of inhabitants of a Trust Territory under auspices of the United Nations, are incompatible and mutually exclusive. Defendant argues that the May 29, 1986, UNTC Resolution No. 2183; Executive Order No. 12569, on October 16, 1986, which terminated the authority of the Secretary of the Interior and the High Commissioner; and the November 3, 1986, Presidential Proclamation No. 5564, were effective to terminate the Trusteeship Agreement with respect to the RMI as of October 21, 1986.

In each of the cases, plaintiffs contend that the Trusteeship Agreement has not been terminated. Plaintiffs in *Juda* and *Peter* argue that the Compact of Free Association is not currently in effect, and cannot go into effect until the Trusteeship Agreement is terminated by action in the Security Council. Plaintiffs in *Nitol* contend that the Compact Act, the Compact of Free Association and Section 177 Agreement represent a bilateral redefinition of the legal relationship between the United States and the people of the Marshall Islands, and that this relationship is defined by the domestic law of the two parties, independently of the status of the Trusteeship Agreement at international law.

Defendant contends the President, in terminating the Trusteeship Agreement, has the option to rely upon UNTC Resolution No. 2183 as the basis for a unilateral declaration that the Trusteeship Agreement may be terminated without action by the UNSC. Defendant further contends that exercise of this option is not subject to judicial review. Defendant fails to recognize that the Trusteeship Agreement and the Compact are two separate documents that involve different parties and raise differing legal issues. The Trusteeship Agreement is between the United States and the UNSC; the Compact is between the United States and the RMI. Trusteeship termination and Compact implementation are two separate issues.

■■■ For purposes of United States domestic law, the Trusteeship Agreement has been recognized as a treaty. *Kabua, Kabua v. United States*, 546 F.2d 381, 385 (Ct.Cl.1976); *Peter v. United States*, 6

Cl.Ct. 768, 779 (1984). Under the Constitution, all treaties are part of the supreme law of the land that binds all courts. U.S. Const. art. VI. Policy questions reflected in treaty obligations are beyond the power of the courts. *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1961); *Goldwater v. Carter*, 444 U.S. 996, 1000 n. 1, 100 S.Ct. 533, 535 n. 1, 62 L.Ed.2d 428 (1979). It is the role of the judiciary, however, to interpret international treaties and to enforce domestic rights arising from them. *United States v. Decker*, 600 F.2d 733, 737 (9th Cir.), *cert. denied*, 444 U.S. 855, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979). Courts of the United States have final authority to interpret an international agreement for purposes of applying it as law in the United States. *Restatement (Revised) Foreign Relations Law of the United States*, § 326.2 (Tentative Final Draft 1985). Whether the Trusteeship Agreement has been or may be terminated unilaterally by the United States is a question of law that may be examined by this court.

There is no provision in the United Nations Charter or in the Trusteeship Agreement that specifically requires approval from the UNSC for termination of a strategic trusteeship agreement. The Trusteeship Agreement itself provides only that no alteration, amendment or termination can be made without United States consent. The failure to provide a procedure for termination indicates the parties could not reach an agreement, and it underscores the intensity of negotiations as to strategic trusts. The ambiguity was a purposeful result of compromise.

■■■ A proper interpretation of the relevant documents requires the conclusion that the Trusteeship Agreement may not be terminated formally until the Security Council has acted. Article 83(1) of the Charter specifically delegates to the Security Council authority to exercise *"all* functions of the United Nations relating to strategic areas." The phrase "including any alteration or amendment" when given its obvious meaning encompasses termination of the entire agreement. *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176,

180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982); *Maximov v. United States*, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963). The word "including" in Article 83(1) indicates that the specified list that follows is illustrative, and not exclusive or of limitation. *Federal Loan Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 4, 86 L.Ed. 65 (1941); *Puerto Rico Maritime Shipping Auth. v. ICC*, 645 F.2d 1102, 1112 n. 26 (D.C.Cir.1981); *United States v. Gertz*, 249 F.2d 662, 666 (9th Cir.1957).

Representatives of the United States, since 1947 and until March 4, 1986, consistently have acknowledged an obligation to seek UNSC approval of termination of the Trusteeship Agreement. In 1947, the United States representative to the Security Council, when the terms of the Trusteeship Agreement were being negotiated, argued that the "draft trusteeship agreement is in the nature of a bilateral contract between the United States on the one hand and the Security Council on the other." With respect to the effort to include language in Article 15 which would have given the Security Council a role in a termination, the United States representative stated that the responsibilities of the Security Council are defined in the Charter, and that "no amendment or termination can take place without approval of the Security Council." 2 U.N. SCOR 476 (1947).

On November 17, 1975, with respect to the Covenant to establish a Commonwealth of the Northern Mariana Islands, the Assistant Secretary of State for Congressional Relations advised the Chairman of the Senate Foreign Relations Committee:

The United States recognizes that it is obligated to seek Security Council approval of termination of the trusteeship agreement. The United States accordingly intends to seek and expects to obtain Security Council approval. The United States does not anticipate that the Security Council would deny or ignore the mandate it shares with the Administering Authority to elicit and respect the the freely expressed wishes of the people for self-determination. If for any reason the Security Council's concurrence were withheld, we would have to face that question at the time.

In connection with consideration of the Compact of Free Association, the Committee on Foreign Affairs, House of Representatives, submitted questions to the State Department. In response to an inquiry on whether the United Nations must "approve the Compact and agree to termination of the Trusteeship Agreement", the State Department answered: "It is the intention of the United States to take up the question of termination of the Trusteeship Agreement at the appropriate time with the Trusteeship Council and the Security Council." *Micronesia Compact of Free Association: A Review of H.J.Res. 620: Hearings Before Comm. on Foreign Affairs, House of Representatives*, 98th Cong., 2d Sess. (1984).

In this litigation, defendant consistently has taken the position that Security Council approval was needed for termination of the Trusteeship Agreement. Defendant's December 23, 1985, motion to suspend the pretrial proceedings stated:

The United States takes the position that the effective date of the Compact should be the date of termination of the United Nations Trusteeship. The United States plans to represent the Compact to the United Nations Security Council in March 1986 and fully expects termination of the trusteeship to occur by April 30, 1986.

Defendant's March 4, 1986, motion to dismiss included this statement:

The United States is preparing to take up the question of termination of the Trusteeship Agreement with the Trusteeship Council and the Security Council of the United Nations. The United States takes the position that the effective date of the Compact should be the date of termination of the Trusteeship.

Defendant would enlarge the role of the UNTC in United Nations procedures applicable to termination of trusteeship agreements. Defendant contends Security Council Resolution No. 70, March 7, 1949, delegated to the UNTC authority to exercise

all of the United Nations functions relevant to the political, economic, social and educational advancement of the inhabitants of the strategic Trust Territory. This argument assumes that after the UNTC has reported to the UNSC that the United States Charter obligations have been discharged, and has made its finding that it is appropriate for the Trusteeship Agreement to be terminated, Resolution No. 70 renders further action by the Security Council unnecessary.

Resolution No. 70 authorized the UNTC to exercise, on behalf of the UNSC, the powers conferred in United Nations Charter Articles 87 and 88 applicable to non-strategic trusteeships that are supervised by the General Assembly. The powers conferred in Articles 87 and 88, however, involve only routine day-to-day functions. They authorize the UNTC to formulate questionnaires to the inhabitants and administering authority of the trust territories, to consider reports by the administering authority, to accept petitions and to examine them in consultation with the administering authority, to provide for periodic visits to the respective trust territories, and such like actions. Resolution No. 70 does no more than implement the provisions of Article 83(3), which authorizes the Security Council to avail itself of the assistance of the Trusteeship Council. Resolution No. 70 did not alter the fundamental responsibility of the Security Council for all functions of the United Nations as to strategic trusts. The United States representative to the Security Council argued that action under Resolution No. 70 did not in any way prejudice the Security Council's "full and ultimate responsibility for all functions of the United Nations relating to strategic trusteeships, or deprive it of its jurisdiction to take such further action as it deems appropriate." UN SCOR (415th meeting) at 4, U.N. S/1280 (1949).

For the non-strategic trusts supervised by the General Assembly, the role of the UNTC has been to provide a report and a recommendation to the General Assembly concerning the political, economic, social and educational advancement of the inhabitants of the trust territory. The proce-dure has been a report and recommendation from the UNTC, followed by a decision of the General Assembly. Ten non-strategic trusteeships have been terminated. In each, the General Assembly, not the UNTC, has passed a resolution specifically declaring the trusteeship agreement involved "shall cease to be in force." It may be that action by the General Assembly, after the UNTC recommendation, has been pro forma. Neither the UNTC nor the General Assembly, however, has ever construed the Charter to permit the UNTC to perform the functions of the General Assembly as to termination of a non-strategic trusteeship agreement. See New Guinea: G.A.Res. 3284 (XXIX) (Dec. 13, 1974); Nauru: G.A.Res. 2347 (XXIII) (Dec. 19, 1967); Ruanda Urundi: G.A.Res. 1746 (XVI) (June 27, 1962); Tanganyika: G.A.Res. 1642 (XVI) (Nov. 11, 1961); Western Samoa: G.A.Res. 1626 (XVI) (Oct. 18, 1961); Cameroons (British): G.A.Res. 1608 (XV) (Apr. 21, 1961); Somaliland: G.A.Res. 1418 (XIV) (Dec. 5, 1959); Togoland (French): G.A. Res. 1416 (XIV) (Dec. 5, 1959); Cameroons (French): G.A.Res. 1349 (XIII) (Mar. 13, 1959); and Togoland (British): G.A.Res. 1044 (XI) (Feb. 24, 1957), *reprinted in* 6–15 D. Djonovich, *United Nations Resolutions,* Series 1, 1956–76 (1984).

Under the United Nations Charter, the role of the Security Council under Charter Article 83(1) with respect to strategic trusts is the same as the role of the General Assembly under Article 85(1) with respect to non-strategic trusts. By analogy, approval of the Security Council should be required to effect a termination of the only strategic trusteeship agreement.

Defendant points to Section 1002 of the Covenant to establish the Commonwealth of the Northern Mariana Islands for authority for the President unilaterally to declare the Trusteeship Agreement terminated, and to bar judicial review. Pub.L. No. 94–241, 90 Stat. 263 (1976) (codified as amended at 48 U.S.C. § 1681 n. (1982)). Unlike the Compact of Free Association, the Covenant expressly provided that portions of the Covenant would be effective prior to termination of the Trusteeship

Agreement. Section 1002 of the Covenant with the Northern Mariana Islands Commonwealth provides:

> The President of the United States will issue a proclamation announcing the termination of the Trusteeship Agreement, or the date on which the Trusteeship Agreement will terminate, and the establishment of the Commonwealth in accordance with this Covenant. Any determination by the President that the Trusteeship Agreement has been terminated or will be terminated on a day certain will be final and will not be subject to review by any authority, judicial or otherwise, of the Trust Territory of the Pacific Islands, the Northern Mariana Islands or the United States.

The authority to announce the termination of a bilateral agreement between the United States and the United Nations is a different matter entirely from authority to terminate the agreement unilaterally. The Senate Report on the Covenant makes it clear that the proclamation establishing the Commonwealth of the Northern Mariana Islands was to be in conjunction with Security Council approval of the termination of the Trusteeship Agreement. Senate Report No. 94–596, 94th Cong. 2d sess., Jan. 27, 1976, at 5, states:

> At the time that the Trusteeship Agreement with the United Nations is terminated the President will issue a proclamation establishing the Commonwealth of the Northern Mariana Islands. According to documentation supplied to the Foreign Relations Committee, the Department of State recognizes it is obligated to seek Security Council approval of the termination of the trusteeship agreement.

In 1976, when the Covenant was approved, the other three governments in the Trust Territory had not come into existence, termination off the Trusteeship Agreement was an event to arise at an unknown future date, and was an event all parties expected to be accomplished after Security Council action. Clearly any limitation on judicial review did not relate to any condition then existing.

Defendant asserts the limitations recognized to prevent judicial relief in *Diggs v. Shultz*, 470 F.2d 461 (D.C.Cir.1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973) also bind this court, and requires judicial deference to the President's declaration that the Trusteeship Agreement is terminated. *Diggs* dealt with the legal effect of a statute (the Byrd Amendment) that was enacted clearly in breach of the United Nations Charter. The court dismissed the complaint, which sought an injunction against the Government for violation of the Charter, on the principle that Congress can denounce a treaty. The court said:

> We think that there can be no blinking the purpose and effect of the Byrd Amendment. It was to detach this country from the U.N. boycott of Southern Rhodesia in blatant disregard of our treaty undertakings....
>
> Under our constitutional scheme, Congress can denounce treaties if it sees fit to do so, and there is nothing the other branches of government can do about it. We consider that this is precisely what Congress has done in this case....

470 F.2d at 466–67 (citations omitted).

The situation in *Diggs* is not at all comparable to the legislative posture with respect to the Compact. In fact, the situation is exactly the opposite of *Diggs*. The Compact was not passed in blatant disregard of treaty undertakings. The Compact Act and the legislative reports relative to its enactment, clearly manifest an intent to comply with treaty obligations to the United Nations.

Defendant concedes that the Trusteeship Agreement continues to be in effect. Proclamation No. 5564 recognizes that until the future political status of Palau is resolved "the United States will continue to discharge its responsibilities in Palau as Administering Authority under the Trusteeship Agreement." The United States has not submitted a formal proposal to the UNSC to terminate the Agreement. There is no contention that Charter Article 83, in the absence of UNSC approval, permits a piecemeal termination of the Trusteeship

Agreement by division of the Trust Territory into four separate areas.

The Programme Budget of April 2, 1987, proposed by the United Nations Secretariat for Biennium 1988–89, provides funding for the UNTC to carry out its responsibilities regarding the "last remaining Territory, the Trust Territory of the Pacific Islands." These responsibilities include provision for the dispatch of visiting missions during the biennium 1988–89.

All of the foregoing reasons support, if not require, the conclusion that the Trusteeship Agreement for the Trust Territory of the Pacific Islands has not been terminated. Accordingly, the Agreement remains in effect de jure at international law until the Security Council has acted.

Defendant points out that action by the Security Council to terminate the trusteeship need not be confined simply to a recognition that the United Nations Article 76(b) objectives for self-government may have been realized, and confirmed by the UNTC. Defendant emphasizes that the UNTC is the United Nations organ responsible for reporting on the supervision of the trusteeship and the status of the progress of the political, economic, social and educational advancement of the inhabitants. Each member of the Security Council, under Charter Article 27, has a unilateral veto on Security Council business. This veto power may be exercised for political reasons entirely extraneous to the capacity for self-government that may be attained by the people of the Marshall Islands, recognized by the Administering Authority, and confirmed in the judgment of the UNTC.

Defendant asserts that the Executive Branch has determined that the Soviet Union intends to exercise its veto power in the UNSC to frustrate the decision of the RMI to enter its new political status with the United States. Defendant further argues that such a veto would unfairly cloud the international status of the RMI, and would create the unacceptable result that the Trusteeship Agreement would continue until such time as the USSR believed it had achieved sufficient influence in Micronesia to permit termination.

It may be that in the trusteeship procedures, comparable to terminations by the General Assembly as to non-strategic trusts, action by the UNSC to terminate the Trusteeship Agreement should be pro forma after the UNTC adopted Resolution No. 2183. The question of when the Trusteeship Agreement formally has been terminated under United Nations procedures, however, is not before this court. The United Nations has its own internal organ, the International Court of Justice, which is the forum for such an issue.

The fact that the Trusteeship Agreement has not been terminated de jure does not resolve the issue of whether the Compact with the RMI is in effect. Actions by the RMI, the UNTC, and the United States determine that issue. As to the RMI, the Trusteeship Agreement is terminated in fact. De facto termination of the Trusteeship Agreement may be accomplished piecemeal, with termination de jure to be deferred until all four parts of the trust territory are brought to a status where the capacity for self-government is recognized. *Morgan Guaranty Trust Co. v. Republic of Palau,* 639 F.Supp. 706 (SDNY 1986).

All approvals required by Compact Section 411 have been given, and all of the steps involved in bringing the Compact with the RMI into effect have been completed. The Compact and the Section 177 Agreement have been signed by the parties; a plebiscite supervised by the UNTC has been held and the vote has been certified as proper. The Compact Act has been passed by the House of Representatives and by the Senate. The President's signature completes enactment of the Compact Act as a Congressional–Executive Agreement, a matter of domestic law. The authority of the High Commissioner has been terminated. The RMI and the United States have executed an agreement that pursuant to Compact Section 411, provides the effective date would be October 21, 1986. The Section 177 Agreement takes effect by its terms simultaneously with the Compact. Accordingly, the Compact of Free Association, the Section 177 Agreement, and Articles X, XI and XII of that

agreement, went into effect on October 21, 1986.

There may be doubt as to the significance at international law in the November 3, 1986, Proclamation that the Trusteeship Agreement has been terminated for three governmental areas. It is clear, however, that the Compact Act, the Compact and the Section 177 Agreement constitute a redefinition of the legal relationship between the United States and the people of the Marshall Islands. This relationship is defined by the domestic law of the two governments. Both the RMI and the United States, since October 21, 1986, have been proceeding in reliance upon the new relationship. In addition, plaintiffs in these cases have pursued legal and financial benefits in reliance on the Compact being in effect.

Plaintiffs in the *Nitol* case suggest that the Section 177 Agreement may not have the force of a statute of the United States, and argue that it is not clear that changes in the jurisdiction of the courts of the United States, or in the scope of the consent of the United States to be sued, have been duly authorized. The *Nitol* plaintiffs point out that the Section 177 Agreement is not embodied verbatim in any act of Congress, and the specific terms were not enacted separately. The text of the Section 177 Agreement is not included in Title 48 of the United States Code, along with the other provisions of the Compact Act, nor is the text included in Title 28, Judiciary and Judicial Procedure.

■ The Section 177 Agreement cannot be carved out of the Compact and its validity separately determined. The overall purpose of the Compact Act must not be lost sight of. The thrust of the Compact Act is to discharge United States obligations to promote the development of the Marshall Island peoples toward self-government. The settlement of claims arising from the nuclear testing program is an integral part of the relationship of the United States and the newly emerged RMI. The settlement cannot be disregarded as if it were not essential to that relationship. To carve out the Section 177 Agreement would amount to a restructuring of the legal relationship that has been recognized by the Congress, the President and the UNTC.

The decision not to enact the terms of the Section 177 Agreement in the Compact Act was part of the compromise in December 1985. When the House-passed H.J. Res. 187 was messaged to the Senate on December 13, 1985, the Section-by-Section Analysis of the Senate Foreign Relations Committee explained that the Senate formula (to require formal action by Congress for any amendment of the various agreements) was adopted in lieu of the House formula (to enact all of the agreements that were incorporated by reference). 131 Cong.Rec. S17,651 (daily ed. Dec. 13, 1985). This agreement is embodied in the Compact Act in Section 101(d).

It is clear that the Section 177 Agreement and Articles X and XII of that Agreement have the force and effect of law. Section 101(d) of the Compact Act provides that any amendment, change or termination of the Section 177 Agreement, "the terms of which are incorporated by reference into the Compact", may be effected only by Act of Congress. The Section 177 Agreement is a defined term in paragraph (1) of Section 103(g) of the Compact Act. Section 177 of the Compact incorporates the Section 177 Agreement by reference into the Compact. Section 471(c) of the Compact states that the Compact "has the force and effect of a statute under the laws of the United States."

The issue of whether plaintiffs' claims may continue to be heard in this court are determined primarily by Compact Act §§ 103(g)(1) and (2), Compact § 177 and § 471(c), and the Section 177 Agreement, Article X, § 1 and Article XII. Analysis begins with the text of these provisions.

Section 177(a) of the Compact provides that the Government of the United States "accepts the responsibility for compensation owing to citizens of the Marshall Islands", for loss or damage resulting from the United States nuclear testing program. In this provision, the United States recognizes it is obligated legally to provide compensation. In the Compact Act, Congress

did not intend to take the plaintiffs' right to just compensation for the takings or their right to obtain damages for breach of contract, as distinguished from removal of their remedy. *See Lynch v. United States,* 292 U.S. 571, 583, 54 S.Ct. 840, 845, 78 L.Ed. 1434 (1934). Payments made pursuant to the procedures authorized in Section 177(b), and implemented in the Section 177 Agreement, are not ex gratia.

The RMI and the United States unquestionably intended that the Section 177 Agreement would be a complete settlement of all claims arising from the nuclear testing program. Paragraph (1) of Section 103(g) of the Compact Act states that it is the intention of Congress that the Section 177 Agreement constitute "a full and final settlement of all claims." Article X of the Section 177 Agreement provides that this Agreement constitutes "the full settlement of all claims past, present and future" of the RMI, its citizens and nationals, including any claims which may be pending in any forum, in the courts of the RMI, and in any court of the United States and its political subdivisions.

Although there is no dispute that Congress intended in paragraph (1) of Compact Act § 103(g), that Compact § 177 was to include a full and final settlement of all claims, the parties disagree as to the meaning of paragraph (2) of Section 103(g). Compact Act § 103(g) is headed "Espousal Provisions." It is clear that Section 103(g) links Article X, "Espousal" with Article XII, "United States Courts" in the Section 177 Agreement. As enacted, however, Section 103(g) makes no reference as to the validity of espousal on the basis of either international or constitutional law.

Plaintiffs argue that paragraph (2) of Section 103(g) requires the court to determine the capacity of the RMI under international law to espouse claims of its citizens, prior to giving effect to Article XII of the Section 177 Agreement. Defendant contends paragraph (2) of Section 103(g) does not purpose to require any judicial determination of the validity of the espousal before claims are dismissed for lack of jurisdiction.

Defendant emphasizes the first sentence of paragraph (2) of Section 103(g), which explicitly states that the Section 177 Agreement is ratified and approved in furtherance of the intention of Congress as stated in paragraph (1) of Section 103(g). Plaintiffs insist that the second sentence of paragraph (2) of Section 103(g) reflects a congressional intent to make the jurisdiction-stripping provisions of Article XII ancillary to the espousal process contemplated in Article X. If that process failed as a valid settlement of plaintiffs' claims, Article XII would have no effect and is to be ignored.

The terms and the content of paragraph (2) of Compact Act § 103(g) changed during the course of H.J.Res. 187 through Congress. The House Committee on Interior and Insular Affairs, in view of legal doubts about the propriety of the espousal provisions, recommended, and on July 25, 1985, the House passed, the original version of paragraph (2) of Section 103(g). At that time, paragraph (2) explicitly provided that Article XII would not prevent judicial resolution of the claims, if a court of competent jurisdiction determined that the provisions of Article X "are invalid as matter of international law or for any other reason." This version of paragraph (2) of Section 103(g) provided:

(2) If, notwithstanding the enactment into law of this joint resolution, a United States court of competent jurisdiction determines that the provisions of Article X of the Agreement between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact (hereafter the "Section 177 Agreement") are invalid as a matter of international law or for any other reason, the provisions of Article XII of the Section 177 Agreement shall not, of themselves, prevent any court of the United States otherwise having jurisdiction over claims described in Articles X and XI of the Section 177 Agreement from entertaining such claims; and the time between the effective date of the Compact and any subsequent final judicial deter-

mination of invalidity of Article X of the Section 177 Agreement shall not be included in any calculations regarding applicable statutes of limitations or other similar limitations pertaining to the presentation of any such claims to any such court.

The House–Senate compromise of paragraph (2) of Section 103(g) reached in the December 1985 meetings, and which was enacted in the Compact Act, revised the language to eliminate all express reference to judicial consideration of Article X.

Plaintiffs rely upon a statement made by the Chairman of the Subcommittee on Public Lands and National Parks, who was floor manager of H.J.Res. 187 in the House of Representatives at the time of the Act's final passage on December 11, 1985. The revisions of paragraph (2) of Section 103(g) were explained as being "to the same effect" as in the original version. The floor manager's statement, in full, as to espousal, was:

> The House bill included language explicitly providing for tolling of the statute of limitations for the period between the effective date of the compact and any subsequent determination by a U.S. court that the espousal provisions, that is, article X of the section 177 subsidiary agreement are invalid as a matter of international law or for any other purposes. The revised version omits this, since it is generally agreed that existing laws and judicial procedures ensure that tolling of the statute of limitations would occur under such circumstances. The House bill also included language specifying that should article X of the section 177 subsidiary agreement be held invalid, article XII of that agreement would have no effect; while this language has been somewhat revised, the new version is to the same effect. The new language is intended to make it clear that court-stripping provisions of article XII of the section 177 agreement have no independent force or effect and their sole function is to implement the provisions of article X. Thus, if article X is valid, espousal stands; and if article X is invalid, claims covered by the espousal provisions will remain justiciable in U.S. courts, regardless of article XII.

131 Cong.Rec. H11,829 (daily ed. Dec. 11, 1985).

Defendant contends this statement is contrary to the compromise agreement, and counters with post-enactment statements made by Senators and other Representatives. Defendant argues that the intent of Congress was to support a final settlement through Section 177, with no reservation about any effect of espousal in Article X on the jurisdictional limitations of Article XII.

Statements made by Senators and Representatives intimately associated with this legislation are contradictory as to what Congress intended in Compact Act § 103(g). It is clear, however, that there was a compromise, that this compromise did not embody the language plaintiffs had sought, and that the provision as passed by the House was rejected. As enacted, the terms of paragraph (2) of Section 103(g) actually contradict plaintiffs' argument. Paragraph (2) of Section 103(g) is a "clarification of the effect" of paragraph (1) of Section 103(g) and of Article X. It is properly subject to the construction that Congress assumed espousal was valid and effective, and that Article X demonstrates the full sweep intended by Congress. The words "solely and exclusively" in the second sentence of paragraph (2) of Section 103(g), in the light of the obvious rejection of the language in the earlier House-passed version, has added significance.

Plaintiffs' argument that the RMI lacks the capacity to espouse plaintiffs' claims is derived from well-recognized concepts in international law involved in the doctrine of continuity of nationality. Plaintiffs cite authoritative treatises for the proposition that generally accepted principles of international law and practice require that a claim be continually owned from the date the claim arose and at least to the date of presentation by nationals of the state asserting them. 8 M. Whiteman, *Digest of International Law*, 1234, 1241 (1970). The rationale behind this doctrine is to preclude abuses that otherwise might result by con-

version of a strong nation into a claim agency on behalf of injured claimants, who availed themselves of liberal naturalization laws for the purpose of procuring espousal of their claims. The United States generally follows the doctrine. A December 15, 1961, letter from the Department of State advised Congress:

> ... [i]t has been the longstanding practice of the Department to decline to espouse claims which were not owned by United States citizens at time of loss or damage. This practice rests upon the universally accepted principle of international law that a state does not have the right to ask another state to pay compensation to it for losses or damages sustained by persons who were not its citizens at the time of loss or damage.

Quoted in 8 M. Whiteman, *Digest of International Law*, at 1233.

Plaintiffs contend that, when the facts giving rise to plaintiffs' causes of action occurred, the inhabitants of the Marshall Islands lacked sovereignty. Accordingly, the RMI under the requirement for continuity of nationality would lack the legal capacity to espouse plaintiffs' claims in 1986. In fact, the RMI was not in existence when plaintiffs' claims arose, and plaintiffs could not have been its citizens during the period the claims arose and ripened. Plaintiffs also note that Article X was negotiated during the period before the RMI was recognized as a self-governing entity, and, that in fact throughout this period the area was under the complete control of the High Commissioner. According to plaintiffs, these considerations render Article X invalid, and makes Article XII without effect as to plaintiffs' claims.

Plaintiffs' analysis of the continuity of nationality doctrine is a correct exposition of international law. The facts of these cases, however, do not accord with the rationale for the doctrine. The Trusteeship Agreement charges the United States to bring a people with a primitive form of government to a status when they would be self-governing or independent. The ramifications in international law of an emerging state, insofar as application of the continuity of nationality doctrine is concerned, are novel and unresolved. The issue becomes: At what stage in the trusteeship process does the new state have capacity to espouse claims of the people who were its inhabitants prior to its creation? That issue need not be resolved. Paragraph (2) of Compact Act § 103(g) is silent on the question of validity of espousal. Article XII is not made contingent upon a judicial determination of the validity of espousal in Article X.

Article XII of the Section 177 Agreement does three things: (1) all claims related to the nuclear testing program "shall be terminated"; (2) no court of the United States "shall have jurisdiction to entertain" claims relating to the nuclear testing program; and (3) any such claims pending in the courts of the United States "shall be dismissed."

There is a question of whether the word "terminated" in the first sentence of Article XII relates to proceedings involving such claims, or to the extinguishment of such claims. Article X, § 2 requires the RMI to terminate "any legal proceedings" in the courts of the Marshall Islands involving claims arising out of the nuclear testing program. Article XI of the Section 177 Agreement requires the RMI to indemnify and hold the United States, and its agents, employees, contractors, citizens and nationals, harmless from all claims and all actions or proceedings which may hereafter be asserted in any court or other judicial forum related in any way to the nuclear testing program. These provisions are persuasive that the word "terminated" in the first sentence of Article XII applies to termination of proceedings, and not to extinguishment of the basic claims involved.

All of plaintiffs' claims have been brought pursuant to the authority in the Tucker Act (28 U.S.C. § 1491(a)(1) (1982)). The Tucker Act is both a grant of jurisdiction and a waiver of sovereign immunity as to all cases within its purview. *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In the context of the claims in these cases, the two concepts are interchangeable.

Plaintiffs' claims are for (1) takings compensable under the Fifth Amendment of the Constitution, and for (2) breach of implied-in-fact contracts within the jurisdiction of the Tucker Act. Both types of claims are asserted against the United States, involve matters of public rights, and are subject to the public rights doctrine. *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67–76, 102 S.Ct. 2858, 2869–74, 73 L.Ed.2d 598 (1982). The doctrine of public rights is based, in part, on the traditional principle of sovereign immunity, which recognizes that the government may attach conditions to its consent to be sued. It also draws upon the principle of separation of powers, and a historical understanding that certain perogatives are reserved to the political branches of the government. *Id.* at 67, 102 S.Ct. at 2869.

On the basis of precedent, plaintiffs contend that Article XII of the Section 177 Agreement, if it is construed to apply to plaintiffs' taking claims and breach of contract claims, is an unconstitutional exercise of legislative power. Plaintiffs point out that Article XII applies to all United States courts and Article X includes the courts of the United States "and its political subdivisions." Such a blanket withdrawal of access to every judicial forum as to a particular class of claims, it is argued, deprives plaintiffs of all judicial remedies for invasion of constitutional rights under the Fifth Amendment, amounts to an intervention in pending cases to assure specific results in the Government's favor, and in itself gives rise to a taking of plaintiffs' causes of action in violation of the Fifth Amendment.

Plaintiffs rely heavily on the decisions in *United States v. Klein*, 80 U.S. 128 (13 Wall), 20 L.Ed. 519 (1871); *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); and *Battaglia v. General Motors Corp.*, 169 F.2d 254 (2d Cir.), *cert. denied*, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

In *Klein*, plaintiff had recovered a judgment in the Court of Claims for the proceeds from abandoned cotton that had been sequestered by Union Soldiers during the Civil War. The Supreme Court in a similar case previously had ruled that a Presidential pardon had purged any participation in the rebellion. While the appeal of *Klein* was pending in the Supreme Court, Congress enacted a proviso to the Court of Claims Appropriations Bill that was expressly made applicable to cases like *Klein*. In the proviso, Congress declared that a Presidential pardon would not be admissible in evidence on the part of any claimant in the Court of Claims as evidence of continuing loyalty, that Presidential pardon established the disloyalty of a claimant, and that, in cases where judgment had already been rendered in the Court of Claims on the basis of a pardon, the Supreme Court on appeal would have "no further jurisdiction of the case, and shall dismiss the same for want of jurisdiction." *United States v. Klein*, 80 U.S. at 134 (13 Wall). The Supreme Court refused to give effect to the proviso, and sustained the judgment of the Court of Claims on the ground that the proviso was unconstitutional in two respects: (1) the proviso prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor (80 U.S. at 146); and (2) the proviso impaired the effect of a pardon, and thus infringed the constitutional power of the Executive (80 U.S. at 148). *See also United States v. Sioux Nation of Indians*, 448 U.S. 371, 404–05, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1980).

The decision in *Klein* is not apposite to the issue of the power of Congress as to plaintiffs' claims in these cases. *Klein* did not involve a complete withdrawal of the consent to sue, or the substitution of an alternative procedure for compensation. Also, it dealt in part with the appellate jurisdiction of the Supreme Court. One purpose of the proviso was to deny to pardons granted by the President the effect which the Supreme Court had adjudged such pardons to have.

In *Battaglia*, plaintiffs sought to recover overtime pay in accordance with the provisions of the Fair Labor Standards Act of 1938. While these suits were pending,

Congress enacted the Portal-to-Portal Act of 1947, section 2 of which provided that no court of the United States would have jurisdiction of any action or proceeding to enforce liability or enforce punishment for failure of an employer to pay minimum wages under the Fair Labor Standards Act. The trial court dismissed the complaints on the ground that the court was without jurisdiction by virtue of section 2 of the Portal-to-Portal Act. The Second Circuit affirmed on the ground that Congress under the Commerce Clause has the power to suppress the statutory pay claims.

Plaintiffs cite *Battaglia* for the proposition that Congress may not enact jurisdictional requirements that prevent vindication of constitutional rights. In the course of its examination of the power of Congress, the court stated that the exercise of that power over court jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. While Congress has the undoubted power to restrict the jurisdiction of courts other than the Supreme Court, it must not exercise that power so as to take private property without just compensation. *Battaglia v. General Motors Corp.*, 169 F.2d at 257.

*Battaglia* did not involve a withdrawal by Congress of the consent to sue the United States; the case involved only private parties. As to the exercise of legislative power with respect to takings compensable under the Fifth Amendment, in plaintiffs' cases Congress has not exercised its power so as to deny plaintiffs compensation for the alleged takings.

*Lynch v. United States* involved policies of yearly renewable term life insurance issued by the United States under the War Risk Insurance Act of 1917, and the action by Congress in the Economy Act of March 20, 1933, to repeal "all laws granting or pertaining to yearly renewable term insurance." The Supreme Court reversed dismissals that had been ordered by the district courts, and affirmed in the circuits. The Supreme Court's ruling was based on the ground that Congress had attempted to abrogate a protected contract right, as contrasted to withdrawal of consent to sue the sovereign. 292 U.S. at 583, 54 S.Ct. at 845.

Plaintiffs cite *Lynch* for the proposition that valid contracts with the United States are property that is within the protection of the Fifth Amendment. 292 U.S. at 579, 54 S.Ct. at 843. Plaintiffs then argue that Congress cannot abolish the claims against the United States in these cases for the taking of property without compensation in violation of the Fifth Amendment.

*Lynch* differs from plaintiffs' cases in significant respects. Plaintiffs' breach of contracts implied-in-fact are allegations that must be proven before any obligation to pay compensation may arise. In *Lynch* the contracts there admittedly were valid and the Government's obligation on the contracts was recognized by all parties and the courts. Plaintiffs' taking claims, similarly, involve substantial evidentiary problems. In the *Nitol* cases, there is the issue of whether in fact there has been any taking, and all of the taking claims involve fact issues related to valuation of the properties allegedly taken and the amount of compensation that rightfully should be paid. Further, in none of these cases, has Congress abolished plaintiffs' claims. The Compact recognizes the United States obligations to compensate for damages from the nuclear testing program and the Section 177 Agreement establishes an alternative tribunal to provide such compensation.

When the United States creates rights in individuals against itself it is under no obligation to provide a remedy through the courts. *United States v. Babcock*, 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919). No litigant in any federal court has the right to have a claim heard in a particular forum or the right to a particular chosen remedy. *Gibbes v. Zimmerman*, 290 U.S. 326, 332, 54 S.Ct. 140, 142, 78 L.Ed. 342 (1933).

In *Lynch*, the Supreme Court recognized the sweep of Congressional power to withdraw the consent of the United States to be sued. That consent can be withdrawn at any time. Congressional power to provide, or withdraw, remedies against the United States is virtually without a limit. The

Sovereign's immunity from suit exists whatever the character of the proceeding, or the source of the right to be enforced. It applies alike to causes of action arising under acts of Congress and to those arising from some violation of rights conferred upon the citizens by the Constitution. Withdrawal of consent to sue on plaintiffs' claims does not imply repudiation. As long as the obligations are recognized, Congress may direct fulfillment without the interposition of either a court or an administrative tribunal. *Lynch v. United States*, 292 U.S. at 582, 54 S.Ct. at 844.

Plaintiffs have varying arguments about the alternative procedure for payment. They first contend that Congress, through the Compact settlement and Article XII of the Section 177 Agreement confronts the court with the precise issue of whether a statute withdrawing jurisdiction and leaving a claimant with no forum for a Fifth Amendment claim is binding on a court. It is clear that the issue at this stage of this litigation is not so narrow. Plaintiffs are not deprived of every forum. An alternative tribunal to provide compensation has been provided.

■ Plaintiffs next recognize that Congress may establish an alternate forum to provide compensation for particular claims. In every case where such an alternate forum has been upheld, however, they point out that the possibility of ultimate resort to the Court of Claims, now the Claims Court, has been preserved, citing *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 124–27, 95 S.Ct. 335, 349–50, 42 L.Ed.2d 320 (1974); *Dames & Moore v. Regan*, 453 U.S. 654, 689–90, 101 S.Ct. 2972, 2991–92, 69 L.Ed.2d 918 (1981). Plaintiffs then argue they are entitled to an opportunity to show, in this court, that the claims settlement provision embodied in the Section 177 Agreement is unconstitutional, without being required to resort to the settlement procedure in the first instance. They assert that Congress can provide an alternative procedure for settlement of plaintiffs' constitutional claims only if that procedure provides "at the time of taking reasonable, certain and adequate provision

for compensation." 419 U.S. at 124–25, 95 S.Ct. at 349. This court, plaintiffs say, cannot uphold the constitutionality of Article XII without first making a determination that the settlement procedure, and Claims Tribunal established under the Section 177 Agreement, satisfy these constitutional requirements.

These assertions are premature. Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract. The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.

Congress, in the Compact Act, has recognized and adopted a procedure that it believes provides a means for final discharge of constitutional obligations for just compensation. Consent to sue on plaintiffs' claims that were previously recognized has been withdrawn. This alternative procedure for compensation cannot be challenged judicially until it has run its course.

Article XII by its terms applies to all courts of the United States. The decision here, of course, is limited to the cases before the United States Claims Court.

■ It is clear that Congress through Article XII intended to withdraw the consent to suit by plaintiffs on the claims in these cases. An unbroken line of decisions holds that Congress may withdraw its consent to sue the Government at any time. *Gold Bondholders Protective Council Inc. v. United States*, 676 F.2d 643, 646 (Ct.Cl. 1982) *citing Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Maricopa County v. Valley Nat'l Bank*, 318 U.S. 357, 63 S.Ct. 587, 87 L.Ed. 834 (1943); *Laycock v. United States*, 230 F.2d 848 (9th Cir.1956). *See*

also *Hannevig v. United States,* 114 Ct.Cl. 410 (1949).

Plaintiffs suggest that *Gold Bondholders* is inconsistent with precedent and was wrongly decided. Decisions of the United States Court of Claims are binding precedent for this court unless and until modified by decisions of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court. USCC Gen.Order No. 1, Oct. 7, 1982. 1 Cl.Ct. XXI, *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed.Cir.1987).

Article XII of the Section 177 Agreement by necessary implication amends the Tucker Act. The consent of the United States to be sued in the Claims Court on plaintiffs' taking claims and breach of contract claims that arise from the United States' nuclear testing program in the Marshall Islands has been withdrawn. Accordingly,

IT IS ORDERED: the Clerk is directed to dismiss the complaint. No costs.