LIPEZ, Circuit Judge,
concurring in the judgment.
I agree with the majority’s denial of relief to Igartúa. I write separately, however, because I would reject Igartúa’s request for declaratory relief on jurisdictional grounds.
I.
I am sympathetic to the aspirations of Puerto Ricans who are citizen residents of Puerto Rico to participate fully in the election of the President and Vice President of the United States. The dissenting judges present their legal positions in support of those aspirations powerfully and eloquently. Nevertheless, “[federal courts are courts of limited jurisdiction,” Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), and that limited jurisdiction does not permit us to decide the issues raised by Igartúa’s request for declaratory relief.
It may seem odd to some that a federal court might not have the power to answer important legal questions involving the interaction between the Constitution, international law, and the rights of American citizens. But, as I will explain below, one cannot simply go to federal court and get an answer to a legal question. Before a federal court can resolve the issues before it, the court must first satisfy itself that, if the plaintiff ultimately won, the decision would probably result in a redress of the plaintiffs grievance. If a judicial victory would probably not produce such a result, the federal court has no power to address the merits of the issues underlying the dispute. In most cases redressability is not a problem. In this case, however, redressability is an insuperable problem.
*153 As the majority ably explains, there are only two methods under our Constitution by which a territory can receive electoral votes: through admission as a state, see U.S. Const, art. IY, § 3, cl. 1, or by special amendment, see id. amend. XXIII. For all practical purposes, only Congress can perform either of these actions, and whether to do so is in Congress’s sole discretion.[8] Thus, the critical jurisdictional question reduces to whether a court can declare Congress’s failure to initiate either of these processes to be a violation of international law — or, as Judge Torruella puts it, whether a court can issue a declaratory judgment that “the United States has taken no steps to meet its obligations under the ICCPR and customary international law to grant equal voting rights to all citizens in the election of the President and Vice President of the United States.” Post at 183-84 (Torruella, J., dissenting).
In my view, the answer to this jurisdictional question does not turn on the precise contents of the particular agreements at issue; whether the agreements are binding or merely “precatory”; whether they have been ratified by the Senate; whether they are self-executing; or even whether the relevant international legal norms derive from agreements at all, as opposed to customary law. Nor does the answer turn on the discretionary nature of a declaratory judgment. Even if those factors were removed, Igartúa’s request for declaratory relief would still face an insuperable obstacle: we lack jurisdiction to decide his international law claim because his grievance is not judicially re-dressable. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (court must address Article III jurisdictional questions before addressing merits, because “[hjypo-thetical jurisdiction produces nothing more than a hypothetical judgment — which comes to the same thing as an advisory opinion”). Unavoidably, Igartúa’s request for a declaratory judgment requires unsupportable speculation about the possibility of a Constitutional amendment or the admission of Puerto Rico as a state. For this reason alone, I conclude that we do not have jurisdiction over his request for declaratory relief.
II.
Under Article III of the Constitution, “[t]he judicial Power shall extend” to “Cases” and “Controversies.” U.S. Const, art. Ill, § 2, cl. 1. The Supreme Court has interpreted this “case or controversy” requirement to mean, among other things, that federal courts do not issue advisory opinions. In particular, a federal court may only exercise jurisdiction over an action if it is “ ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38, 43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). If the plaintiff cannot show that his injury “is likely to be redressed by a favorable decision,” the federal court’s “exercise of its power ... would be gratuitous and thus inconsistent with the Art. Ill limitation.” Simon, 426 U.S. at 38, 96 S.Ct. 1917. This limitation applies with undiminished force to actions for declaratory judgment. See Calderon v. Ashmus, 523 U.S. 740, 745, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (“[W]e must first address whether this action for a declaratory judgment is the sort of ‘Article III’ *154 ‘case or controversy’ to which federal courts are limited.”); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (The Declaratory Judgment Act “is operative only in respect to controversies which are such in the constitutional sense.”).
This is not a case where a plaintiff claims injury from an allegedly unconstitutional act of Congress. Rather, Igartúa claims injury from Congress’s inaction in the face of certain international agreements: its failure to either admit Puerto Rico as a state or to propose a Constitutional amendment allocating electors to Puerto Rico.[9] Since it is beyond dispute that we could not order Congress to do either of those things, Judge Torruella says that we should issue a declaratory judgment that Congress has not fulfilled its duties under international agreements. Judge Torruella then says that Congress, chastened by this declaration, would voluntarily choose to act — presumably either by admitting Puerto Rico as a state or proposing an amendment similar to the Twenty-third. In Judge Torruella’s view, “it is substantially likely that a declaration by this Court that the United States is in violation of international law will result in some form of relief to the United States citizens who reside in Puerto Rico.” Post at 180 (Torruella, J., dissenting).
Respectfully, the basis for this speculation about Congress initiating the process of Constitutional amendment or invoking the Constitutional process for the admission of a new state is unexplained. We have already warned about the hazards of such speculation when only statutory changes by a state legislature were at stake. In Biszko v. RIHT Financial Corp., 758 F.2d 769 (1st Cir.1985), plaintiffs challenged a Rhode Island statute that arguably created market conditions under which plaintiffs could not receive full market value for their shares in a Rhode Island bank.[10] They argued that their suit was redressable because if the federal court invalidated the statute, “the Rhode Island legislature would soon be moved, sua sponte or by the persuasive efforts of non-New England banks, to pass a statute permitting [a more competitive market].” Id. at 773. We described such speculation concerning “a benefit that [plaintiffs] might gain were the Rhode Island legislature to react in a certain way to a decision by this court” as “not merely speculative” *155 but “positively chimerical.” Id.[11]
If a legislative body would be within its rights to ignore the court’s decision, and the plaintiff cannot convince the court that it is “ ‘likely,’ as opposed to merely ‘speculative,’ ” Lujan, 504 U.S. at 561, 112 S.Ct. 2130, that the legislature will react in the way that he hopes, the redressability requirement has not been met. Cf. Chicago & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (“[I]f the President may completely disregard the judgment of the court, it would be only because it is one the courts were not authorized to render. Judgments, within the powers vested in courts by the Judiciary Article of the Constitution, may not lawfully be revised, overturned or refused faith and credit by another Department of Government.”). The cases that Judge Torruella cites for the contrary proposition (that Congress would be “substantially likely” to redress Igartúa’s grievance in light of a judicial declaration) are easily distinguishable and actually reveal why the redressability requirement prevents declaratory relief here.
Judge Torruella relies on Utah v. Evans, 536 U.S. 452, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002), a dispute ultimately stemming from the Census Bureau’s method of calculating population in the 2000 census. The Bureau used a statistical method that calculated the population of Utah as somewhat lower, relative to the population of North Carolina, than if the Bureau had not used that method. See id. at 457-58, 122 S.Ct. 2191. Pursuant to statute, the Bureau’s final report was formally transmitted to Congress, and the Clerk of the House of Representatives then transmitted to each state governor “ ‘a certificate of the number of Representatives to which [that] State [was] entitled.’ ” Id. at 461, 122 S.Ct. 2191 (quoting 2 U.S.C. § 2a(b)). Due to the statistical method that the Bureau used, Utah received one less representative, and North Carolina one more representative, than if the Bureau had not used that method. Id. at 458, 122 S.Ct. 2191. After receiving the results, Utah sued the government, arguing that the Bureau’s statistical method violated another census-related statute, and sought an injunction ordering the Bureau to reissue its report with different results. Id. at 459, 122 S.Ct. 2191.
North Carolina intervened, arguing that the case was not justiciable because the relief sought would not redress Utah’s grievance. Although North Carolina “[did] not deny that the courts [could] order the [Bureau] to recalculate the numbers and to recertify the official census result,” it reasoned that “Utah suffered], not simply from the lack of a proper census ‘report’ (a document), but more importantly from the lack of the additional congressional Representative to which North Carolina believes itself entitled as a consequence of the filing of that document.” Id. at 461, 122 S.Ct. 2191. In other words, although the court could order a new census report as Utah requested, a new report would not result in Utah gaining a Representative. That outcome would depend entirely on whether Congress, acting in its unbridled discretion, would choose to reapportion, or just ignore the report.
The Court concluded that the injury cited by Utah was redressable:
[W]e believe it likely that Utah’s victory here would bring about the ultimate relief that Utah seeks. Victory would mean a declaration leading, or an injunction requiring, the Secretary to sub *156 stitute a new “report” for the old one. Should the new report contain a different conclusion about the relative populations of North Carolina and Utah, the relevant calculations and consequent apportionment-related steps would be purely mechanical; and several months would remain prior to the first post-2000 census congressional election. Under these circumstances, it would seem ... “substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute.... ”
Id. at 463-64, 122 S.Ct. 2191 (quoting Franklin v. Massachusetts, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (opinion of O’Connor, J.)). Two points about Evans bear emphasis. First, compliance with the actual court order or declaration relating to the need for a new census report “would be purely mechanical.” 536 U.S. at 463, 122 S.Ct. 2191. Second, while ultimate redress of Utah’s grievance would require discretionary action by elected officials, that action — recer-tifying the total number of Representatives for two states — was of a piece with a process so regular and commonplace that Congress has, in ordinary circumstances, delegated it by statute to the Clerk of the House.[12] Here, by contrast, the Congressional action envisioned (admitting a state or initiating the process of Constitutional amendment) is exceptional, lengthy, complex, and highly uncertain. Consequently, how Congress would react to a declaration is considerably more speculative here than in Evans.[13]
A second case cited by Judge Torruella, Juda v. United States, 13 Cl.Ct. 667 (1987), relates more directly to international agreements. Juda concerned the status of the Marshall Islands. After World War II, the United States entered into an agreement with the United Nations (UN) to administer the Marshall Islands as a UN trusteeship, in an arrangement designed to be temporary. In the 1970s, the United States decided to terminate the trusteeship and offer the territory a compact of free association. The compact agreement was submitted to a plebiscite, and was resoundingly approved. Congress then enacted, and the President signed, legislation formally adopting the compact. After the President issued an executive order implementing the compact, the UN Trusteeship Council determined that the trusteeship had terminated. See id. at 671-76.
Some years later, Marshall Islander plaintiffs filed a claim against the United States under the Tucker Act, 28 U.S.C. § 1491,[14] which had undisputedly applied to the Islands while they were still under the trusteeship. The United States argued, however, that the compact agreement withdrew the government’s waiver of sovereign immunity. See 13 Cl.Ct. at 677. The plaintiffs responded that, under the rules applicable to UN trusteeships, the trusteeship had not been validly terminat *157 ed, and therefore the compact — which withdrew the government’s consent to suit — never took effect. See id. at 678.
The court rejected the plaintiffs’ argument that failure to terminate the trusteeship properly meant that the compact (and with it the withdrawal of consent to suit) had never taken effect. Rather, the court found that whether “the Trusteeship Agreement has not been terminated de jure does not resolve the issue of whether the Compact ... is in effect.” Id. at 682. Ultimately, the court concluded that the compact did take effect, and therefore that the United States had withdrawn its consent to be sued. See id. at 683, 690. Thus, it dismissed the complaint. Id. at 690.
Nevertheless, in a lengthy dictum, the court explained that the trusteeship had in fact not been properly terminated. The court held that the trusteeship could not be formally terminated until the UN Security Council so voted. See id. at 678-82. Some time after the Juda decision issued, the government took the court’s advice and formally asked the Security Council to terminate the trusteeship, which it did. See United Nations Security Council Resolution 683 (Dee. 22, 1990). That dictum, and the government’s decision to take the court’s advice, is the precedent upon which Judge Torruella relies.
Yet the Juda court did not “declare” anything — it dismissed the plaintiffs’ complaint, did not even mention a declaratory judgment, and is cited by Judge Torruella only for a dictum. More importantly, in Juda there was no dispute that both Congress and the President intended to terminate the trusteeship; indeed, by enacting the compact and issuing an executive order implementing it, the political branches thought they had done exactly that. Juda noted that these actions did not have their intended effect due to a technical misunderstanding of UN procedures, and explained how the elected branches could properly achieve what they had already sought to do. The likelihood that Congress and the President would follow the court’s advice was not just “substantial,” it was a near certainty. There is nothing remotely approaching such certainty here.[15]
III.
There is no precedent for issuing a declaratory judgment in the circumstances of this case, and for good reason. A declaratory judgment “is a procedural device that provides a new, noncoercive remedy ... in cases involving an actual controversy that *158 has not reached the stage at which either party may seek a coercive remedy ... and in cases in which a party who could sue for coercive relief has not yet done so.” B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1428 (Fed.Cir.1997) (emphasis added). Here, however, no coercive remedy would ever be available. Congress would be perfectly within its rights to ignore whatever a federal court said. The court’s declaratory judgment would be, in essence, an advisory opinion.
As the Supreme Court explained in a different context:
In all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces — the payment of damages, or some specific performance, or the termination of some conduct. Redress is sought through the court, but from, the defendant. This is no less true of a declaratory judgment suit than of any other action. The real value of the judicial pronouncement — what makes it a proper judicial resolution of a “case or controversy” rather than an advisory opinion — is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff.
Hewitt v. Helms, 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) (describing test for “prevailing party” under 42 U.S.C. § 1988). Here there is only hope and speculation that Congress, in response to a declaratory judgment about a violation of international law, would invoke cumbersome and contentious processes relating to Constitutional amendments or the admission of a new state to eventually give citizen residents of Puerto Rico the right to vote for President and Vice President. Such hope and speculation does not satisfy the “case or controversy” requirement of Article III. On that basis alone, I would decline to exercise jurisdiction over Igar-túa’s request for declaratory relief.

. There is an exception, in theory: if two-thirds of state legislatures so request, Congress must convene a Constitutional convention. See U.S. Const, art. V. However, no such convention has ever been convened since the adoption of the Constitution.

. The dissents suggest that there might be other alternatives by which Congress could grant the Presidential vote to residents of Puerto Rico. The only specific suggestion is one first advanced by Judge Leval in Romeu v. Cohen, 265 F.3d 118, 128-30 (2d Cir.2001) (Leval, J., writing separately), under which Congress would require each state to accept a proportional share of territorial voters. See post at 89 (Howard, J., dissenting). This suggestion has been critiqued on the ground that there is "no authority in the Constitution for the Congress (even with the states’ consent) to enact such a provision.” Romeu, 265 F.3d at 121 (Walker, Jr., C.J., concurring); see also id. at 136 (Walker, Jr., C.J., concurring) ("I see only two remedies afforded by the Constitution: (1) statehood ..., or (2) a constitutional amendment.”). At any rate, for purposes of redressability analysis, it is no more likely that Congress would adopt Judge Le-val's suggestion (which is probably not Constitutionally permissible) than one of the two alternatives that the Constitution provides.

. The statute permitted a Rhode Island bank to be acquired by an out-of-state bank, but only if the other bank was based in another New England state. The plaintiffs were shareholders of a Rhode Island bank that had agreed to merge with a Massachusetts bank, and they sought to block the merger. See id. at 770-71. They argued that the limitation to New England banks reduced competition and that, without that restriction, an out-of-state bank would have had to pay more for their stock. See id. at 771.

. We analyzed this argument under the rubric of the "injury” requirement, but our reasoning on that point applies to the redressa-bility requirement.

.After Congress receives the statement listing the number of representatives to which each state is entitled, "[i]t shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled.” 2 U.S.C. § 2a(b).

. Moreover, one of the two methods of redress contemplated-Constitutional amendment — would require action not just by Congress, but also the legislatures of thirty-eight states. See U.S. Const, art. V.

. The Tucker Act grants jurisdiction to the Court of Federal Claims (then known as the Claims Court) for claims against the United States, and provides the government's consent to such suits.

. A third case cited by Judge Torruella, Federal Election Commission v. Akins, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), does not involve the likelihood of action by Congress. Akins was a petition for review of an administrative agency's dismissal of an administrative complaint. See id. at 18, 118 S.Ct. 1777. The agency's governing statute specifically authorized judicial review of an agency’s decision not to take certain action, see 2 U.S.C. § 437g(a)(8)(A), and provided that the district court "may declare that the dismissal of [a] complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days,” id. § 437g(a)(8)(C). Thus, Akins involved an administrative agency which Congress placed under unusually close judicial oversight, even extending to the agency’s exercise of prosecutorial discretion, for which every declaration was potentially accompanied by a coercive order "to conform with such declaration within 30 days.” We are not dealing in this case with a subordinate government agency, created by statute, with carefully crafted provisions for substantive judicial review over the agency's decision to do nothing. Rather, the party whose inaction Igartúa complains of is Congress itself, a coequal branch of government that is Constitutionally free to ignore any potential declaration that it should or must perform various actions entrusted to its sole discretion by the Constitution itself. The redressability analysis in Akins does not apply to this case.